UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Christopher Williams : Case No.
    Plaintiff, :
     :
  -V- :
     :
Angel Quiros, Commissioner; :
Sharonda Carlos, Deputy Commissioner; :
William Mulligan, Deputy Commissioner; :
Nick Rodriguez, Disrict Administrator; :
Jesus Guadarrama, Warden; Pelczar, GMO; :
Bell, GMO; Luis Perez, Captain; :
    Defendants. :

## INTRODUCTION

The plaintiff brings forth this complaint against the defendants for the violations of his constitutional rights guaranteed him pursuant to the Eighth and Fourteenth Amendements to the United States Constitution and Article First section 10 of the Connecticut Constiutuion and all other applicable state and federal laws, statutes, rules and regulations, sounding in tort.

## JURISDICTION

This court has jurisdiction over the instant action pursuant to 42 U.S.C §§ 1983 & 1988 and 28 U.S.C § 1343(a)(3), for the defendants violation of constitutional laws under color of state law.

## SUPPLEMENTAL JURISDICTION

The plaintiff brings forth his state law claim(s) to the Federal Court pursuant to this courts supplemental jurisdiction under 28 U.S.C § 1367. Upon information and belief this court has supplemental jurisdiction over the plaintiff's state law claim(s) because (1) There is a claim arising under the Federal Constitution or Federal law; (2) The relationship between the Federal claim(s) and the state law claim(sO permits the conclusion that the entire action comprises but one constitutional case; (3) The Federal claim(s) has substance sufficient

to confer subject matter jurisdiction on the court; and (4) The state and federal claim(s) derive from a common nucleus of operative facts.

## VENUE

Venue is proper pursuant to 28 U.S.C § 1391, as a substantial part of the events giving rise to this action occurred in the district of Connecticut.

Upon information and belief this court has personal jurisdiction over the defendant(s) because (a) thay are residents of the state or regularly do business in the state; (b) Committed tortious act(s) within the state; (c) committed tortious act(s) without the state; or (d) caused injury within the state and regularly do business in the state.

## PARTIES

The plaintiff **Christopher Williams** was at all time relevant to this action a prisoner in the custody and care of the Department of Correction ("Department"), and is currently assigned to the Osborn Correctional Institution, located at 335 Bilton Rd. Somers, CT. 06071. The Defendant.

The defendant **ANGEL QUIROS** was at all times relevant to this action the Commissioner of the Department of Correction and had all legal reponsibilities that a associated with that assignment.

The defendant **SHARONDA CARLOS** was at all times relevant to this action the Deputy Commissioner of the Department of Correction and had all leagl responsibilities that are associated with that assignment.

The Defendant **WILLIAM MULLIGAN** was at all times relevant to this acion the Deputy Commissioner of the Department of Correction and had all leagl responsibilities that are associated with that assignment.

The Defendant NICK RODRIGUEZ was at all times relevant to this action the District Administrator of District 1, of the Department of Corrections and had all legal responsibilities associated with that assignment.

The defendant JESUS GUADARRMA was at all times relevant to this action Warden of Osborn Correctional Institution of the Department of Correction and had all legal resposibilities that are associated with that assignment.

The defendant PELCZAR was at all times relevant to this action Maintenace Supervisor at Osborn Correctional Institution, for the Department of Correction and had all legal responsibilities that are associated with that assignment.

The defendant BELL was at all times relevant to this action Lead Maintenance Supervisor/ Plant Engineer for Osborn Correctional Institution, for the Department of Correction and had all legal responsibilities that are associated with that assignment.

The defendant LUIS PEREZ was at all times relevant to this action Unit Manager/ Captain at Osborn Correctional Institution, for the Department of Correction and had all legal responibilities that are associated with that assignment.

## SERVICE OF PROCESS

The defendants, and each of them, can be served with this complaint at the Legal Affairs Office located at 24 Wolcott Hill Rd. Wethersfield, CT. 06109

## STATEMENT OF FACTS

1. At all times relevant to this action the plaintiff was a prisoner in the custody and care of the Department of Correction ("Department") and assigned to the Osborn Correctional Institution ("OCI"), located at 335 Bilton Rd. Somers, CT. 06071.

2. Legionnaires disease is a sever form of Pnemonia-lung infection usually caused by a bacterium known as legionella.

3. Most people catch Legionnaires disease by inhaling the bacteria from water or soil... Older adults, smokers and people with weakened immune systems are particularly susceptible to legionnaires disease.

4. The Legioneela bacterium also causes Pontiac Fever, a milder illness resembling the flu, pontiac fever usually clears on its own, but untreated legionnaires disease can be fatal. Although prompt treatment with antibiotics usually cures legionnaires disease, some people continue to have problems after treatment.

5. Legionnaires disease usually develops two to ten days after exposure to legioneela bacteria. It frequently begins with the following signs and symptoms: Headaches; Muscle aches; fever may be 104°F (40°C) or higher. By the second or third day the infected person develops other signs and symptoms that can include: Cough, which might bring up mucus and sometimes blood; shortness of breath; chest pain; gastrointestinal symtoms, such as nausea, vomiting and diarrhea; confusion or other mental changes.

6. Although legionaires diseas primarily affects the lungs, it occasionally can cause infection in wounds and in other parts of the body, including the heart.

7. A mild form of legionnaires disease — known as pontiac fever — can produce fever, chills, headache and muscle aches. Pontiac fever doesn't infect your lungs, and symptoms usually clears within two to five days.

8. Diagnosing and treating legionnaires disease as soon as possible can help shorten the recovery period and prevent serious complications. For people at high risk, such as smokers or older adults, prompts treatments is critical.

9. The bacterium legionella pneumophila is responsible for most causes of legionella disease. Outdoors, legionella bacteria services in soil and water, but rarely causes infection. However, legionella bacteria can multiply in water systems made by humans, such as air conditioners. Although it's possible to get legionnaires disease from home plumbing, most outbreaks have occurred in large buildings.

10. Most people become infected when they inhale microscopic water droplets containing legionella bacteria. This possibly from the spray from a shower, faucet or whirlpool, or water from ventilation systems in a large building. Outbreaks have been linked to: Hot tubes and whirlpools; colling towers in air conditioning systems; hot water tanks and heaters; decorative fountains; swimming pools; birthing pools; drinking water; and showers.

11. Besides by breathing in water droplets, the infection can be transmitted in other ways, including: <u>Aspiration</u>, This occurs when liquids accidentlly enter your lungs, usually because you cough or choke while drinking. If you aspirate water containing legionella bacteria, you can develop legionnaires disease. <u>Soil</u>, A few people have contracted legionnaires disease after working in a garden or

using contaminated potting soil.

12. Not everyone exposed to legionella bacteria becomes sick. infection is more likely to develop in those who: <u>Smoke</u>. Smoking damages the lungs making you more susceptible to all types of lung infections; <u>Having a Weakened Immune System</u>. This can be a result of HIV/AIDS or certain medications, especially corticosteroids and drugs taken to prevent organ rejection after a transplant; <u>Having a Chroic Lung Disease or Other Serious Condition</u>. This includes emphysema, diabetes, kidney disease or cancer; and <u>Are 50 years of Age</u>. or older

13. Legionnaires disease can lead to a number of life-threatening complications, including: Respiratory Failure; Septic Shock; and Acute Kidney Failure. When not treated promptly, Legionnaires disease can be fatal.

14. Outbreaks of legionnaires disease are preventable, but prevention requires water management systems in buildings that ensure that water is monitored and cleaned regularly.

15. Legionnaires disease (Legionellosis) is a bacterial infection that was first identified following a 1976 outbreak of pneumonia at an American Legion convention in Philadelphia.

16. Legionella thrive in warm aquatic enviornments and are relatively resistant to the effects of chlorine and heat.

17. Twenty to forty percent (20%-40%) of cases exhibit gastointestinal symptoms. The clinical presentation of legionnaires disease is not generally clinically distiguishable from other causes of community-associated pneumonia. This can lead to cases of legionellosis being misdiagnosed.

18. The incubation period of legionnaires disease is 2-10 days with an average of 5-6 days. Chest X-Rays are needed to diagnos the

pneumonia caused by the clinically indistiguishable from those patients with Pneuococcal Pneumonia or Mycoplasma Pneumonia, which are common causes of PCR test on Sputum, Blood, or Lung Tissue, but the most common diagnostic test is the Urine Antigen test.

19. As early as June, 2021, the defendants informed Osborn's staff that legionnaires had been discovered.

20. In June, 2021 the incarcerated population within Osborn had not been informed that legionnaires had been discovered within the facility.

21. Although it was widely known that legionnaires was present and how it could be contracted the defendants failed to inform the incarcerated population.

22. As early as July, 2021 the defendants has knowledge that it had been a second inmate diagnosed with Legionnaires disease.

23. In July, 2021 the incarcerated population within Osborn had not been informed that legionnaires had been discovered for the second time within the facility.

24. In August and September, 2021 the defendants failed to inform the incarcerated population within Osborn that Legionnaires was present within the facility, in stead the defendants continued to only release Roll Call Memos to Osborn's staff, regarding the presence of legionnaires.

25. In August and September, 2021 the incarcerated population within Osborn had not been informed by any Department of Correction Staff, Contractor or Collaborator that legionaires was present within facility.

26. On October 12 2021 the defendant Captain Perez (Perez) issued a Inmate Memo Addressed to inmates housed within Osborn's H-Block informing us that we would be moving to B-Block on Wednesday October13, 2021, the memo stated nothing of legionnaires.

27. On October 14, 2021 defendant Deputy Commissioner Mulligan released a Inmate Notice addressed to H-Block inmates temporarily reassigned to B-Block, the memo stated:

> The inmate population from H-Block is being temporarily reassigned to B-Block. Two inmates have been found to have legionnaires disease, a lung infection that is treated with antibiotics. The transfer will enable the agency's contracted vendor to implement the Department of Public Health's remediation protocols per the CDC. This may take several weeks, but the inmates will be returned to H-Block as soon as the remediation is completed.

28. The defendants had knowledge of the source of the Legionella-contamination, but again failed to inform the inmate population.

29. Starting in November- December, 2021 defendant Pelczar and his subordinate maintainance staff began installing water filters on the shower pipes in B-Block, once asked if the filters would be added to the sinks in the cells Pelczar stated, "No". The defendant Pelzar, then stated that he was only instructed to do the showers.

30. The plaintiff asked Pelczar if the water was contaminated with legionella bacteria, Pelczar stated that he could not provide me with any information on the status or reason for the filters being added to the showers, due to "Safety and Security" reasons.

31. The plaintiff contends that the source of the water supplied to Osborn Correctional Institution comes from two wells located on its property, defendant Bell is assigned to the task of monitoring the water quailty of Osborn's water supply.

32. The plaintiff contends that the water supplied to the shower

32. The plaintiff contends that the water supplied to the showers is the same water supplied to the cell, as well as all other water pumped into B-Block and H-Block.

33. On several ocassions in September, 2021 defendant Bell came to H-Block with DOC's contracted vendor TRC and collected several water samples from various cells within H-Block.

34. On several occassions in October, 2021 defendant Bell returned to H-Block with contracted vendor TRC and again collected several samples of water from various areas of the housing unit including inmates's cells.

35. The defendant refused to make public the water test results, alleging it was a safety and security concern.

36. In November 2021 defendant Guadarrama began moving entire housing units (Blocks-Housing Units) to the Gymnasium for temporary housing due to the contaminated water within the water system at Osborn Correctional Institution.

37. The defendant continue to hide the exact contaminates being found within the drinking water supply, and have now adopted the universal term we're doing construction projects in the evacuated housing units's

38. The plaintiff has been experiencing fever, headaches, muscle aches, and intestinal pains prior to the discovery of the inmate with legionnaires in June, 2021. The plaintiff was seen by medical staff in Osborn Correctional Institution during this time but was never tested for legionnaires or Pontiac Fever, instead the plaintiff was given Ibuprophen, Simethicone, and metamucil. The symptoms would go away, but return periodically.

39. The plaintiff again wrote a request to medical, after being informed of the inmates who contracted legionnaires in H-Block, being that the plaintiff has been housed in H-Block for several years, complaining of fevers, headaches, muscle aches and intestinal pains, but the plaintiff was called to medical to be tested days after the incubation period for Pontiac Fever had lapsed, but had subsequently tested negative for Legionnaires disease.

40. The plaintiff has wrote to be tested recently (June,2022) but the nurse refused to test stating," Do you think you have it..."

40. The incubation period for Pontiac Fever is 5-66 hours, most often 24-48 hours. Symtoms of Pontiac Fever go away on their own in two to five days without treatment and without causing further problems.

42. Arsenic is a cumlative poison. Some people have a greater tolerence for it than others. At times there is a lag between ingestion and the onset of symtoms. Very minute quantities are capsble of producing poisoning.

43. On June 24, 2021 Collen Gallagher received and E-mail from Cyr, which stated that Cyr was aware of the water issue reguarding levels of Arsenic.

44. The plaintiff contends that Osborn's incarcerated population had not been notified that there were arsenic levels above the EPA standards.

45. The defendand knew of and disreguarded the risk that arsenic poisoning posed upon the incarcerated population, allowing the plaintiff to ingest arsenic-contaminated water without his knowledge and/or consent.

46. The defendant did nothing to mitigate the plaintiff's exposure to arsenic... no bottle water was provided, no filters were added to the cell sinks and no notice has been provided to the prisoner population.

47. the plaintiff contends that he is not claiming that he has a right to a contaminat-free, healthy environment, the plaintiff is claiming that the defendants failed to take meaningful action to mitigate the risk associated with widely known contaminates such as arsenic and legionella and allowed the plaintiff to unknowingly receive substances detrimental to his health while the defendants engaged in conduct to decieve the plaintiff about the source and scope of the contamination, which prevented the plaintiff from mitigating his exposure to those contaminates.

48. The defendants did not provide notice of water which was contaminated wiyh arsenic, the defendants were aware of the risk of harm to the plaintiff's health resulting from daily ingestion of arsenic-contaminated water, legionella-contaminated water.

49. The defendants permitted a nuisance to be created and maintained on premises under their control.

50. The defendants are responsible for providing safe drinking water to prisoners

51. Osborn's water problems go back decades to the 1990s, when wells in the area were found to be contaminated by chemicals from a dry cleaning operation that was located on the site, because of that contamination, local residents that shared the same well water as Osborn had to hook up to a municipal water supply.

52. The prison stopped using the two wells that were found to be contaminated, switching to three others that met health standards, according to the Department of Correction.

53. The plaintiff contends that OCI employees are prohibited from drinking, cooking or bathing with OCI water, according to staff Roll Call Memos.

54. Long term arsenic exposure may cause enlarge postate and white pigmentation spots, 3-7 years for white pigmentation spots to manifest.

55. The defendants were negligent/indifferent in allowing others to discharge arsenic on the ground, in failing to test the water from time to time, and failing to warn the plaintiff that the water in the well might become contaminated, did become contaminated, and the contamination found was above EPA standards and actions levels.

56. The plaintiff contends that he has written numerous medical request to be tested for arsenic exposure, but those test has not been preformes to date.

57. The plaintiff has suffered from a dark pigmentation on his back that can not be explained by medical staff, yet the plaintiff has been repeatedly denied testing for arsenic exposure.

58. The defendants know of the risk, but ignored them, choosing instead to conceal them, and their origins, which prevented the plaintiff from taking timely action on the matter to seek relief necessary to mitigate those risk on his own.

59. The plaintiff in currently being exposed to water contaminated with arsenic and legionella, the defendants are currently moving inmates from block to block because their housing units are testing positive from legionella and arsenic at levels above EPA action levels.

60. The plaintiff contends that the defendant's actions are of no use because the water supplied to the housing units derive from the same source, therefore, all housing units are exposed to the contaminated water simultaneously, so moving prisoners from one area of the facility to another area is of on effect on the exposure to the relocated prisoner, what it does do is establish that the defendants are using the least effecatious means possible to fix the problem, in fact, the defendants actions do nothing at all to fix the problem they're simply engaging in wack-a-mole, instead of simply connecting the facility to the municiple water source, as done by local residents affected by the Department contamination of their well in the 1990s.

61. Arsenic causes very specific skin rashes that occur in a temporal progression after long latency period of drinking high levels of arsenic in water. First, hyperpigmentation lesions that cluster on the trunk and extremities in a tear-drop shapped pattern occur. then, hyperkerotic lesion occur in the palms and soles of the feet.

62. Classic neuropathy of arsenic poisoning involved sensation to the hands and feet, a so called stocking and glove neuropathy.

63. Long term exposure to Arsenic is linked to cancer.

## RELIEF REQUESTED

WHEREFORE, the plaintiff requests the following relief from the defendant(s) in their individual capacity(ies):

    A.    Issue a declaratory judgment stating that:

        1. The action(s) of the defendant(s) and each of them, violated the rights of the plaintiff under the First amendment to the United States Constitution, when they intentionally subjected the plaintiff to Legionella-contaminated water. Violating the plaintiff's state law claims under the Connecticut Constitution derive from the same set of facts and claims;

        2. The action(s) of the defendant(s) and each of them, violated the rights of the plaintiff under the Eighth amendment to the United States Contitution, when they intentionally subjected the plaintiff's body to legionella-contaminated drinking water; arsenic-contaminated drinking water; and lead-contaminated drinking water. The plaintiff's state law claims under the Connecticut Constitution derive from the same set of facts and claims;

        3. The action(s) of the defendants(s) and each of them, violated the rights of the plaintiff under the Fourteenth amendment to the United States Constitution, when they subjected the plaintiff body to legionella-contaminated drinking water; arsenic-contaminated drinking water; and lead-contaminated drinking water, without the plaintiff's knowledge or informed consent. The plaintiff's state law claims under the Connecticut Constitution derive from the same set of fact and claims;

    B.    Issue a preliminary/permenant injunction stating that:

        1. The defendant(s) and their agents, officers, directors, trustees, employees, and anyone acting in concert with them who receives actual notice of this order:
        **a. Shall immediately provide the plaintiff with two(2)** gallons of bottle water, purchased by the defendant(s), each calender day;

        b. Shall, within thirty (30) days of the order provide the plaintiff with the bottle water;

        c. Shall, alternatively, allow the plaintiff to purchase a portable water bottle filter, within thirty (30) days of this order;

C.  The award of Compensatory damages from the defendant(s) in their individual capacity(ies), to include but not limited to:

   1. For damages from the defendant(s), and each of them, jointly and severely, in their individual capacity(ies) in the amount of $250,000 (Two Hundred Fifty Thousand Dollars) from each defendant;

D.  The award of Punitve damages from the defendant(s) in their individaul capacity(ies), to include but not limited to:

   1. For damages from the defendant(s), and each of them, jointly and severely, in their individual capacity(ies) in the amount of $250,000 (Two Hundred Fifty Thousand Dollars) from each defendant;

E.  The demands the defendant(s) be ordered to pay the plaintiff's court costs , fees, litigation costs, and reasonable attorney fees in accordance with 42 U.S.C §1988 and C.G.S. §52-251b(a) in their individual capacity(ies) jointly and severely;

F.  For the court to grant such other relief as it may appear the plaintiff is entitles by law;

G.  The plaintiff demands trial by jury;

BY: *[signature]*
Christopher Williams
Osborn Corr. Inst.
335 Bilton Rd.
Somers, CT. 06071

## VERIFICATION

PURSUANT TO 28 U.S.C §1746, I CHRISTOPHER WILLIAMS DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Dated this __28__ day of __October__, 2022

*[signature]*
Christopher Williams